**FILED**

FEB - 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1  Ahmed S. Osman
   12807 Bluet Ln
2  Silver Spring, MD 20906
   (301)933-4402
3  (202)318-8886 (Fax)

4

5              **UNITED STATES DISTRCIT COURT**

6                    **DISTRCIT OF COLUMBIA**

7

8      **AHMED SIDDIG OSMAN,**

9      *12807 Bluet Ln*  Plaintiff,          CASE NUMBER  1:06CV00191

       *Solver spring, MD20906*              JUDGE: Henry H. Kennedy
10     *301-933-4402*  vs.
                                             DECK TYPE: Employment Discrimination
11     FREDERICK W. Schieck,  ,
                                             DATE STAMP: 02/03/2006
12      Acting Administrator,
                                             **COMPLAINT**
13  U.S. Agency for International
                                             **EMPLOYMENT DISCRIMINATION**
14      Development, (AID),
                                             **DEMAND FOR JURY TRIAL**
15          Agency

16                  Defendant)

17

18           **COMPLAINT AND DEMAND FOR JURY TRIAL**

19                            -1-

20  1. Plaintiff resides at:

21  Address                12807 Bluet Ln

22  City, State & Zip Code Silver Spring, Maryland 20906

23  Phone / Fax            301-933-4402/Fax 202-318-8886

24  E-Mail                 Nuba22@Verizon.net

25  2. Defendant is located at:

26  Address                1300 Pennsylvania Ave, NW

27                         Ronald Reagan Building

28                         Washington, D.C. 20523-1000

    USAID is an independent federal government agency.

# JURISDICTION

## -2-

This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employment discrimination as amended, 42 U.S.C. §§ 2000e TO 2000e-17 et seq. (race, color, religion, national origin and reprisal)and the Age Discrimination in Employment Act of 1967 (ADEA), as codified, 29 U.S.C. §§ 621-634 and the Civil Rights Act of 1991. Equitable and other relief is sought under 42.U.S.C. Section 2000-5(g).

# Venue

## -3-

Plaintiff relies on the special venue provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f) (3). Venue is appropriate in this Court because the unlawful employment practice is alleged to have been committed in the District of Columbia, in which the employment records relevant to such practice are maintained and administered, in which the plaintiff would have worked but for the alleged unlawful employment practice, and in which the defendant has his principal office.

# EXHAUSTION OF ADMINISTRATIVE REMEDIES

## -4-

Plaintiff has exhausted his administrative remedies in accordance with 42 U.S.C. Section 2000e-16(c) in that he filed an Administrative EEO Complaint on April 13, 2001, asserting that his non-consideration and non-selection for the two posts he had applied for were motivated by illegal discrimination against him on the basis of

national origin, race, religion, age and reprisal for engagement in a previous complaint with EEO.

**-5-**

The complaint was accepted by letter dated April 23, 2001. It was investigated and referred to administrative Judge Laura Khare who issued the Acknowledgment Order on December 2, 2002. A second Acknowledgment Order was issued due to the Agency's claim it had not receive the first one. Discovery was scheduled to end on February 10, 2003. The Complainant responded to the discovery requests of the Agency.

**-6-**

The Agency refused to respond to any of the discovery requests submitted by the Complainant and filed a Motion for a Protective Order. The Complainant submitted several motions to the Administrative Judge to compel the Agency to respond but to no avail. The Complainant filed a Complaint to the EEOC Deputy Director to force the Agency to respond.

**-7-**

On May 20, 2003 Administrative Judge Khaire issued a Discovery Order denying "The Agency's Motion for a Protective Order" and asking it to "respond in full to the first thirty interrogatories, admissions, and documents submitted by the Complainant" and that " under the discovery procedures set forth in the Acknowledgment Order, Complainant is entitled to a "reasonable number of depositions"" and that "the Agency is reminded that it must make the requested federal employees available for deposition …"

**-8-**

The Agency counsel improperly terminated five on-going depositions by walking out

the deponent and canceling a sixth scheduled one. She then filed a motion for

Summary Judgment. The Administrative Judge stayed the Agency's motion for

Summary Judgment as being immature and ordered redeposition of witnesses.

In July 2004 Administrative Judge Khaire left the EEOC and the case went stale for six

months. In January 2005 the case was assigned to a new Administrative Judge Gerald

Goldstein. Without communicating with the parties Judge Goldstein invoked on his

own initiative the Agency's stayed motion for summary judgment and acted on it in

favor of the Agency without giving the Complainant the right to respond to it or to

complete the scheduled redeposition of witnesses as ordered by his predecessor.

The Complainant appealed the Agency's final order on the ground that he was denied

due process of the law. Complainant was not allowed to complete the discovery

process as ordered by Administrative Judge Khaire. The Agency did not invoke its

stayed motion for summary judgment anticipating the completion of the redeposition

of witnesses by the Complainant. Judge Goldstein invoked the Agency's stayed

summary judgment and acted on it without giving the Complainant the right to

respond to it.

**-9-**

On November 15, 2005 EEOC decided to affirm the Agency's final order and issued the

Complainant his right to file a civil suit in an appropriate U.S. District Court within

ninety calendar days from the date of his receipt of its decision.

4

## ISSUES IN THE COMPLAINT

### -10-

The Plaintiff alleges that he was discriminated against based on national origin, race, religion, reprisal for prior EEO complaint activities and age when he was not selected for:

(1) The Personal Services Contract (PSC) position for the Program Officer for Sudan, advertised under Solicitation Number M/OP-00-1277, issued June 9, 200, and was never informed of the status of his application; and

(2) On October 4, 200, he was not selected for the Personal Services Contract position of Conflict Analyst in the Bureau for Humanitarian Response (BHR), advertised under Solicitation Number M/OP-00-1321, issued on June 23, 2000.

## Persistence Discrimination

### -11-

The Plaintiff believes that the defendant is still discriminating against him for he has applied for many positions solicited by the Defendant for which he was aptly qualified but was turned. Among these are the following:

**(1) Program Management/Implementation for Non-Presence Countries in the Middle East and South Asia**

Solicitation Number: M/OP-01-1171

Issued Date: June 27, 2001

**(2) Program Officer for Southern Sudan**

SOLICITATION NO: M/OP-02-855

ISSUANCE DATE:  April 3, 2002


**(3) Senior Humanitarian Advisor (SHA) - Northern Sudan**

SOLICITATION NO: M/OP-03-870

ISSUANCE DATE: March 28, 2003


**(4) Program Manager (Sudan)**

Sol. DCHA/OTI -04-0334.

Issuance Date: December 29, 2003


**(5) Program Officer for Southern Sudan**

SOLICITATION NO: M/OP/DCHA/DOFDA-04-642

ISSUANCE DATE:  February 20, 2004


**(6)Senior Economic Advisor - Yemen**

SOLICITATION No. RFP# 279-04-004

Issuance Date: March 29, 2004


**(7) Program Manager (Sudan)**

Sol. DCHA/OTI -04-0334.

Issuance Date: December 29, 2003

**(8)  Field Advisor / IDP Advisor.**
Solicitation No. DCHA/OTI-04-1847

Issuance Date:


**(9) Field Advisor / Field Advisor / IDP Advisor**
No. DCHA/OTI-04-2258
Issuance Date:

6

**(10) Response Alternatives for Technical Services (RATS)**

DCHA/OFDA-04-1701

Issuance Date:

## FACTS GIVING RISE TO PLAINTIFF'S CAUSE OF ACTION
### -12-

Plaintiff is an American of Sudanese national origin. He first came to the U.S. in 1960 as a young scholar guest of American high schools and families. He was selected in a national competition supervised by the American Embassy in Sudan, University of Khartoum and the Ministry of Education. The New York Herald Tribune was the sponsor for him and forty other students representing their respective countries. In 1962 the plaintiff was awarded the coveted Wein International Scholarship at Brandeis University and the Dartmouth Class of 1956 Foreign Scholar Scholarship which carried with home hospitality and interaction with the Class of 1956. It was a difficult choice to make but he opted for Dartmouth following consultation with the staff of the American embassy in Sudan. The plaintiff was the first Sudanese to graduate from an American college; others went to Russia, Eastern Europe and U.K.

### -13-

An international development and humanitarian assistance specialist Plaintiff has worked for over twenty years in Africa, the Middle East and Asia. He graduated from Dartmouth College and did his graduate work in economic development, law and development and international development institutions at Harvard and Fletcher School of Law and Diplomacy earning his MA, MALD and passing his Ph.D. orals with

distinction. He joined Dartmouth College as a lecturer and Director of its Foreign Study Program in West Africa in 1974. From 1976 to 1993 He worked as Senior Economist and Economic Advisor for Islamic Development Bank, in Jeddah, Saudi Arabia and Kuwait Development Fund, in Kuwait implementing their development and humanitarian assistance to more than forty countries in Africa and Asia.

-14-

After twenty years of work in development and humanitarian assistance the Plaintiff came back to the States. Since USAID was doing work similar to what he was doing in Africa he got interested in working with it. An opportunity opened in 1994 when two positions for field representatives in Sudan were advertised. An applicant who was working in Sera Lanka who had no experience in Africa was selected. The selectee did not complete his two year assignment.

-15-

The Plaintiff filed a complaint of discrimination with EEO and left to Sudan in 1994 to volunteer his services in humanitarian assistance, community development, governance and human rights. He returned to the States in June 1999.

-16-

In June 2000 Plaintiff applied for the following two Personal Service Contracts (PSCs) solicited by USAID through its subcontractor GlobalCorps:

> (1)Program Officer for Sudan, issued on June 9, 2000, under Solicitation Number M/OP-00-1277; and
> (2)Conflict Analyst, issued on June 23, 2000, under Solicitation Number M/OP-00-1321.

8

Mr. Kirk Dohne of GlobalCorps informed the Plaintiff by letter dated October 4, 2000 that he was not selected for the Conflict Analyst position. He mentioned to the Plaintiff that he was overqualified for the job.

Plaintiff was weary for not having heard about his earlier application for the position of Program Officer for Sudan. He immediately contacted Kirk Dohne of GlobalCorps enquiring about the status of his application for the earlier position of Program Officer for Sudan. Mr. Dohne told him that he was not selected for that position and that he had sent him a letter to that fact. The Plaintiff told him that he did not receive it and asked him to send it again. He promised to send it but never did. Finding him evasive on the issue the Plaintiff told him that he was going to file a complaint of discrimination if did not a written response of his non-selection. Mr. Dohne warned him that if he filed a complaint he would never be hired with USAID. Demands by the Plaintiff for a written response from the Agency or GlobalCorps about the outcome of his application for the position of Program Officer for Sudan went unheeded until now. Neither would respond.

## REPORT OF EEO COUNSELOR
### -16-

EEO Counselor, Mr. Russell Backus, reported the following facts in his EEO Counselor Report dated February 15, 2001:

"Documents discussed below for both solicitations are available in the M/OP files. Both selection processes were characterized by irregularities and mistakes that complicated the inquiry process. Although these irregularities were not necessarily related to the Complainant's EEO concerns, they apparently resulted in hesitance by the concerned parties to participate in the counseling process. Where as Ms. Eugenia [Mercedes Eugenia, Division Chief and Contracting Officer] agreed initially to set up a

1  meeting with BHR representative so that we could initiate discussion of the

2  Complainant's concerns, she also pursued actions to ensure that the irregularities that

3  occurred in this selection process were not repeated in the future. This apparently

4  resulted in a decision by concerned parties in BHR to avoid discussing the matter. This

5  position was possibly supported by M/OP management. Although there appeared to be

6  resistance to meeting with the Counselor to discuss the selection process, after the

7  case had been reviewed completely and a decision made not to comply with the

8  Complainant's proposed remedy, Ms. Eugenia agreed to meet with the Complainant,

9  along with a representative of BHR [Bureau of Humanitarian Response], to ensure that

10  the Complainant understood the selection process and to explore alternative

11  remedies. However, the Complainant did not agree to meet with M/OP staff after

12  they made a firm decision not to accept his proposed remedy".

### Conflict Analyst Position, M/OP-00-1321

-17-

15  "There were 105 applicants, 19 of which were ranked by GlobalCorps (a BHR

16  contractor) on category A, the highest of four pre-selection categories. (A=most

17  qualified; B=less qualified, but still good, C=lacking in required skills; D=disqualified

18  due to a lack of required qualifications). The Complainant was ranked in category A.

19  "A key selection document in the M/OP file consists of an August 4 email from

20  Carleene Dei, Director of AFR/SD, to Aji Joshi and Dana Ott of AFR/SD and Ruth

21  Buckley of AFR/DP. This email (1) lists Ms. Dei's choice of candidates to be

22  interviewed (six plus a runner-up), (2) requests the addressees to submit their choices

23  to the Office secretary, and (3) suggests that, on this basis, Mr. Joshi "should be able

24  to make the final selection and we should be able to set up interviews." This email

25  was forwarded by Mr. Joshi to Angela Martin of BHR/OTI on August 11 without

26  comment; apparently constituting AFR agreed choice of candidates for interview. Ms.

27  Martin, obviously representing BHR in the selection process, replied to Mr. Joshi by

28  email on August 11, listing her choices for interview (six plus one optional). Her list

was identical to Ms. Dei's with one exception. The Complainant was not included in either list.

"These emails (which are attached at Tab B) indicate that (1) the review committee did not meet until interview were held, and (2) the committee consisted of the five people mentioned above, four from AFR and one from BHR. The document containing these emails also reveals at least two irregularities in the selection process. Fist, Ms. Dei's email included selection criteria that are not totally consistent with the criteria included in the solicitation. Ms. Martin noted in her email that she agreed with these "selection criteria." It is significant that Ms. Dei' first criteria states: "I eliminated the candidates that I thought were overqualified ..." In this regard the Complainant was told by the GlobalCorps representative during a phone conversation that he was over-qualified. The second selection irregularity was that at least two of the committee members (Angela Martin and Dana Ott) were not direct hire agency employees.

"Notwithstanding the criteria used to select candidates for interview, the 8/25/00 selection memorandum from Carleene Dei to Mercedes Eugenia (attached at Tab C) includes, as attachment, the criteria used to evaluate the candidates who were interviewed. These criteria were the same as those contained in the solicitation document (see Tab D attachment).

### Sudan Program Officer position, M/OP-00-1277

-18-

"It would appear from the M/OP file that the Complainant's application was not fully considered. His application was mixed with the application documents of another individual with the same last name - A.H. Osman of Salt Lake City. It is not clear that A.H. Osman applied for the Sudan Program Officer position; his letter of application contained in the M/OP file is dated 9/23/9, and it refers to another position and solicitation number: "Field Officer, M/OP-99-2146; Pristina, Kosovo."

GlobalCorps submitted its preliminary rankings in the form of a table that includes the name, brief summary of qualifications, and rating. Of the 52 applicants for this position, A.H. Osman is listed on the first page with preliminary ranking in the "A" category (attached at Tab E). The summary qualifications is clearly taken from his resume.

"There is no resume, letter of application, or other document in the M/OP file for the Complainant except for his Optional Form 612, which is filed together with A.H. Osman's resume. A.H. Osman's 9/23/99 letter of transmittal noted above, ad five letters of recommendation for A.H. Osman, all dated in or before 1999. He is referred to in these letters as Abdulkhadir Osman, Abdul Osman, and Abdulkadir Haju Osman. These documents, including the Complainant's Optional Form 612 are attached at Tab F." [End of EEO Counselor Report].

## AFFIDAVITS OF MANAGEMENT AND SELECTION PANEL OFFICIALS
### -19-

EEO investigator, Alexander Mason, took affidavits of management and selection panel officials involved in the discrimination complaint of the Plaintiff during the period June 27, 2001 to September 9, 2001.

Some statements given in these affidavits, taken under oath, are inconsistent with each other and contradict statements given later under admissions of facts, interrogatories and in the depositions.

Following are parts of the affidavits given by members of the Selection Committee (Greg Gottlieb, Sydel Maher and Edward (Ted) Maly) in charge of selecting the Program Officer for Sudan. The Selection Memorandum for the Program Officer for Sudan, dated 12 July, 2000, signed by Ms. Tami Halmrast-Sanchez, Supervisor of Mr. Greg Gottlieb, states:

"A selection committee was comprised of BHR.OFDA Sudan Disaster Operation Specialist Ted Maly, BHR/OFD Senior Regional advisor for the ARO Greg Gottlieb, and BHR/OFDA/PS Administrative Officer for Overseas Operations Sydel Maher. Each member of the Selection Committee independently reviewed the applications, and developed a short list of top candidates. The Selection Committee met on 3 July to discuss their top choices and develop a consolidated list of candidates."

The signed affidavits are dated as follows:

Greg Gottlieb            08/17/2001
Edward (Ted) Maly        08/21/2001
Sydel Maher              08/22/2001

Question 03        "Who is your immediate supervisor?  Who was your immediate supervisor August 2000?"

Gottlieb's Answer:      "Tamra Halmrast-Sanchez."

Maher's Answer:         "Jean Hacken, Jean Hacken."

Maly's Answer:          "Current Supervisor Greg Gottlieb
                         Supervisor in August 2000, Mikaela Meredith"

Question 06        "Regarding the Personal Services Contract position of Program Officer for Sudan, were you involved at all in screening, evaluating, and/or interviewing applicants for the position. If yes, respond to the statements or questions listed below."

Gottlieb's Answer:      "AS Senior Regional Advisor for Africa, the Program Officer position fell under my supervision. I looked over the book

that contained the CVs of candidates. However, I was not involved in
the evaluating, interviewing, or selection of candidates.

Maher's Answer: "Yes."

Maly's Answer:          No answer

a.    "Was Mr. Osman an applicant for the position?

Gottlieb's Answer:      "I do not know".

Maher's Answer .        " Yes."

Maly's Answer           "From his complaint as outlined above, I assume he was a
candidate, but I do not recall his application specifically. He was not
among the top three candidates I chose to review in greater detail."

b.    "Was Mr. Osman among the applicants identified by GlobalCorps in
Category A or B?

Gottlieb's Answer:      "I do not know".

Maher's Answer          "I do not recall".

Maly's Answer:          "As noted above, I do recall Mr. Osman's application, and
therefore do not know in which category he was placed by Global
Corps."

c.    "What was the basic evaluation materials(s) used to screen the reduce
the number of the applicants identified in Category A to those to be
interviewed? Were any candidates in Category B interviewed? If yes, list
their names.

Gottlieb's Answer:      "I do not know."

Maher's Answer:         No candidates were interviewed."

Maly's Answer:          "Qualifications which I used in reviewing applicants
included: Experience in managing humanitarian assistance programs;
familiarity with the context and working environment of northern Sudan;

familiarity with OFDA operating procedures and its role in humanitarian

response within USAID; general requirements as outlined in the

solicitation."

d. "Who set up the screening and/or interview panel? Who were the panel members who participated in this phase of the selection process?"

Gottlieb's Answer:" I believe Mr. Ted Maly set it up, but I am not sure. I believe

Ms. Kimberly Smith participated on the panel. I do recollect

any other members."

Maher's Answer:    "I believe Ted Maly set up the panel, Ted Maly, Greg Gottlieb."

Maly's Answer:    " Due to my familiarity with the working environment in Sudan, I helped arrange up the screening panel, with feedback from others in the division who were familiar with the process. Greg Gottlieb, Sydel Maher and I made up the screening panel."

e. "Were there any specific evaluation materials used to screen the applicants to be interviewed?

Gottlieb's Answer:    "I do know."

Maher's Answer:    "I do not understand the question."

Maly's Answer:    "Each member of the selection committee was to review the applicants, as organized and prioritized by Global Corps, and chose their top three candidates. The review process was up to the individual, and based on the qualifications as listed in the solicitation and knowledge of what the job entailed."

f.   "Were there any work sheets or documentation used to rank the candidates and/or to determine the individuals to be interviewed? If yes, please provide your work sheet or give the name of the individual the information was turned to. If no and all candidates in Category A were not interviewed, give an explanation as to how you arrived at the individuals to be interviewed."

Gottlieb's Answer:    "I do not know."

Maher's Answer:    "No individuals were interviewed."

Maly's Answer:    "I no longer have notes on my review of the candidates since the selection was made over twelve months ago (June 2000). It is standard practice not hold unto the binders of applications following a selection."

g.   "Were there any work sheets used by the panel members of the interview results? If yes, provide copies or give the name of the individual the work sheets were turned to. If no, give an explanation as to how you arrived at the individuals recommended to be selected?

Gottlieb's Answer:    "I do not know" I wasn't on the panel".

Maher's Answer:    "Resumes of candidates on the A list were reviewed by the panel, compared against requirements of OFDA's need and a selection made."

Maly's Answer:    "I reviewed each candidate in categories A and B, highlighted qualifications on each application, and made informal notes from {for] my own use and comparison. Comparing these, I chose three candidates, ranking order, for comparison with the choices of the other members of the screening committee."

16

h. "Was Mr. Osman interviewed? If no, give an explanation as to why he
    wasn't interviewed?"

Gottlieb's Answer:    "I do not know."

Maher's Answer:       "No."

Maly's Answer:        "All members of the panel chose the same top candidate, a
                      recommendation memo was drafted to OFDA senior management
                      to hire the unanimous choice."

|                     "Who made the selection: (a) management official (who), or
                      (b) the evaluation/interview panel?

Gottlieb's Answer:    "I do not know."

Maher's Answer:       "Panel recommended a candidate to Sr. Mgt.  Sr. Mgt.
                      approved the selection."

Maly's Answer: "Final hiring decisions are made by OFDA senior management. I do
                      not recall to whom the memo was presented, but there should be
                      a copy at OFDA/ Washington."

Question 09       "Is there any additional information relevant accepted issues in
                  this complaint for investigation that should be entered? If yes,
                  explain."

Gottlieb's Answer:    "No."

Maher's Answer:       "I do not know."

Maly's Answer:        "I feel there needs to be clarification on why the
                      solicitation of input into this investigation was so significantly
                      delayed. This delay negatively impacts the investigation, as it is

unreasonable to expect clear recollection of individual candidates fourteen months after review of their applications."

## AGENCY'S RESPONSE TO REQUEST FOR ADMISIONS
### -20-

## Directed at Gregory Gottlieb (dated June 16, 2003)

1. 1 was not physically present at the selection panel meeting held on July 3, 2000. I don't remember.

2. I did not recommend to the selection panel the selection of Ms. Jacquelyn Poole Galdas as the Program Officer for Sudan,

**Denied.**

2.    Contrary to the statement in the 'Action Memorandum, Subject: Request Approval to Hire Jacquelyn Poole-Galdas as the Program Officer for Khartoum, Sudan,''I was not on the panel' as I asserted in my affidavit given on 08/17/2000.

**After being reminded by a colleague as to the panel's composition, I can say I was on the panel.**

3.    The statement I gave in my affidavit on 08/17/01, under penalty of perjury that 'I was not involved in the evaluating or selection of the candidates' is still true.

**After being reminded by a colleague of the panel's composition, I can say I was on the selection panel.**

## Directed at Tamra Halmrast-Sanchez

### -21-

1. From the Action Memorandum I signed and being the immediate supervisor of Mr. Greg C. Gottlieb in August 2000, I knew then and now that he was involved in the selection panel for the Program Officer for Sudan.
**Admitted.**


3. Mr. Greg Gottlieb, the senior most member of the selection panel for the Program Officer for Sudan, and the would be supervisor of that position, denies in his affidavit his membership in the selection panel and knowledge of its work, while the other two members of the panel, Ms. Sydel Maher and Mr. Ted Maly confirm in their affidavits that he was the third member of the selection panel.
I don't know.

## Directed at Sydel Maher

### -22-

1. In reading the application of A.H. Osman in 'Part A' of the Resume Book, I did not find anything unusual or contradictory that would have warranted raising it with my panel members, GlobalCorps or the Agency.

**I don't remember.**

2. I did not turn over to the Agency any documents or materials that show how I evaluated and ranked candidates.

**I don't remember.**

# Greg Gottlieb Deposition

## -23-

18    Q    It's now established that this OF-612 of

19  the complainant was part of the application of A.H.

20  Osman who was not an application.

21        MS. PERCIACCANTE:  It's not established,

22  but it has been stipulated.

71

1        MR. OSMAN:  Okay.  Is there a

2  disagreement about that?

3        MS. PERCIACCANTE:  No.  There's no

4  reasons to ask questions about it either because

5  it's been stipulated.

6        BY MR. OSMAN:

7    Q    This was part of the application of A.H.

8  Osman.  When you read the application of A.H.

9  Osman, do you recall seeing this OF-612 which

10  doesn't belong to him?

11    A    I don't recall seeing this document, no.

12    Q    Now, I have given you two pieces of

13  information, the cover letter of A.H. Osman in

14  which he says that he is applying for a job in

15  Kosovo, and I have given you the OF-612 of the

16  complainant which was an applicant but was not

17  listed as an applicant in the resume book.  These

18  are two pieces of information which are there.

19  Could you tell me how you and as a selection--as a

20  member of the selection committee skipped noticing

21  something like this?

22          MS. PERCIACCANTE:  Excuse me.  I object.

72

1  He can't testify as to what other members of the

2  selection committee knew, and, in fact, you've

3  already deposed them.  So if you want to ask him

4  what he knew, please go ahead.

5          MR. OSMAN:

6      Q    Could you tell me, as far as you are

7  concerned, such a flagrant thing of somebody who is

8  not applying and within his application of somebody

9  who is applying, and you having read this

10  application--

11      A    Yes.

12      Q    --that how come you didn't notice

13  something like that?

14      A    Yeah.  I tell you what.  Now that I've

15  looked at this document and you've showed me this,

16 I have one recollection. This helps me to recall.

17 I think--I'm trying remember, but I think we said

18 something to them about some mix-up, that it

19 appeared that there was something wrong here, that

20 something didn't match. I have a recollection of

21 that.

22    Q    You did--

73

1    A    But beyond that specific, I don't

2 remember--I remember something that wasn't right

3 with some application, and it could have been this

4 one. I think that's my recollection. As I said, I

5 don't have any specific--that's what I recall, that

6 there was some--we were looking through them and

7 something didn't seem to match up on something.

8 That's all I recall.

9    Q    And to whom did you tell this?

10    A    I don't know. I don't know if we told

11 Kirk Dohne or Ted or whoever. I don't know. I

12 don't remember.

13    Q    Who is Kirk?

14    A    Kirk Dohne from Excel Associates.

15    Q    I see. You know him personally. Right?

16    A    I know who he is, yes.

17    Q    You met him?

18    A    I met him once, yes.

19    Q    Did you have interaction during this

20  selection process with him?

21    A    I don't remember. I don't have any

22  recollection. I can't remember.

74

1    Q    And what did he say when you told him

2  this?

3    A    I don't remember what was said about it,

4  but she showing me this and showing me this guy,

5  what I remember was that I do remember vaguely

6  thinking something was wasn't quite right with

7  things that got listed. I don't know. I don't

8  have any--I don't know who happened about it. I

9  just remember there was some confusion about it

10  because there were--there just seemed to be mixed

11  up papers.

12    Q    And other members, Ted Mali and Sydel,

13 also were aware of this.  Right?

14    A    I don't know if they were.  Maybe they

15 were.  This is just my recollection of it.

16    Q    My question is this--

17    A    I'm trying to remember.

18    Q    I'm trying to help you.

19    A    I'm saying I don't remember whether we

20 had a conversation about it.  It's likely that we

21 did.  I mean I don't remember the--you know, what

22 I'm saying is I don't remember the conversation,

75

1 but I do remember that there was some confusion as

2 we looked through these CVs.

3    Q    And you don't recall what action

4 GlobalCorps took?

5    A    I don't, no.  I don't.

6    Q    And so when you saw this confusion in

7 your evaluation, did you just set that applicant

8 aside, A.H. Osman?

9    A    I don't remember.  I don't know what

10 happened. I mean, I can't remember. As I said

11 earlier, I don't really have much of--I don't have

12 a real recollection of going through the process.

13 You know what I'm saying? I don't have a specific

14 picture in my mind of sitting and doing. So I'm

15 not sure what happened. I don't know what

16 happened. I can't remember what went on with

17 whatever that confusion was.

18     Q    And this, of course, was before the

19 final selection. Right?

20     A    I would be surmising. I would guessing

21 to say one way or the another. It probably

22 would--I mean mostly likely it took place while we

76

1 were reviewing the CVs, yes.

2     Q    In a case like this when you find that

3 such gross confusion--

4         MS. PERCIACCANTE: I don't think we've

5 established it's gross confusion. There was some

6 confusion. It was a mix-up of resumes.

7         MR. OSMAN: Whatever you want to tell

8  me. To you, it is not gross. To me, it is gross,

9  you know. It depends on how you view it. If you

10  are an applicant like me, you would have called it

11  gross.

12        BY MR. OSMAN:

13    Q   Anyway, don't you think something like

14  this, especially that GlobalCorps is a

15  subcontracted company to USAID and it has

16  responsibilities, should have been reported in

17  writing to OFDA so that such things could be

18  avoided in the future?

19    A   I would just--you know, people make

20  mistakes. It's--people have, you know, the same

21  last names. Somebody just made a mistake. I don't

22  know. I mean I can't answer your question in terms

                        77

1  of how you categorize it. It's a mistake. I don't

2  recall Kirk Dohne specifically was told about it.

3  He could have been, and I'm sure they would try to

4  rectify and be more careful in the future, just

5  like anybody that makes a mistake.

6    Q   **Mistakes are made, but, you know, when a**

7 mistake like this is done, don't you think it

8 should be recorded?

9     MS. PERCIACCANTE:  Asked and answered.

10    THE WITNESS:  Yeah.  That's true.

11    BY MR. OSMAN:

12   Q  Do you know what reply the agency gave

13 to the complainant about his application?

14   A  No, I don't.

## JURY DEMAND

-24-

The Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C.

Section 1981a..

-25-

    Wherefore, Plaintiff prays that the Court grant such relief as may be appropriate,

including injunctive orders, damages, costs, and attorney fees.

Respectfully Submitted,

Ahmed Siddig Osman

12807 Bluet Ln

Silver Spring, MD 20905

(301) 933-4402